NBERZELs

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                v.                          23 Cr. 11 (PAE)

5    EFREM ZELONY-MINDELL,

6                                            Settlement
                      Defendant.
7    ------------------------------x

8
                                            New York, N.Y.
9                                           November 14, 2023
                                            3:00 p.m.
10

11   Before:

12                   HON. PAUL A. ENGELMAYER,

13                                          District Judge

14                          APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     LISA DANIELS
17        Assistant United States Attorney

18   FEDERAL DEFENDERS OF NEW YORK
          Attorneys for Defendant
19   BY:  JONATHAN MARVINNY

20

21   Also Present:
     Matthew Deragon, Special Agent, FBI

22

23

24

25

NBERZELs

```
 1            (Case called)
 2            MS. DANIELS:  Good afternoon, your Honor.  Lisa
 3    Daniels for the government, and I'm joined by Special Agent
 4    Matthew Deragon.
 5            THE COURT:  Good afternoon, Ms. Daniels, and good
 6    afternoon, Special Agent Deragon.
 7            MR. MARVINNY:  Good afternoon, your Honor.  Federal
 8    Defenders of New York, by Jonathan Marvinny, for Efrem
 9    Zelony-Mindell.
10            THE COURT:  Good afternoon Mr. Marvinny, and good
11    afternoon to you, Mr. Zelony-Mindell.  I understand that your
12    client, rather than going by mister goes by Mx.  I want to do
13    that, and I will do my very best to do that.  Forgive me if I
14    fall into the habit of doing it.  Is the correct pronunciation
15    of Mx. "mix"?
16            MR. MARVINNY:  That is correct, your Honor.
17            THE COURT:  That is how your client would prefer I
18    address him?
19            MR. MARVINNY:  That's correct, your Honor.  And I have
20    also made mistakes in that regard, and Mx. Zelony-Mindell
21    understands.
22            THE COURT:  And it is Mx. Zelony-Mindell?
23            MR. MARVINNY:  Yes.  And thank you for moving things
24    around, and it's very much appreciated by my client and the
25    family of Mx. Zelony-Mindell.
```

NBERZELs

|    |    |
|----|----|
| 1  | THE COURT:  I'm happy to have done that.  I am sorry |
| 2  | that the conflicting schedule created uncertainty about whether |
| 3  | it would be attainable, but Mr. Smallman tried to find a way to |
| 4  | make it work.  We had a witness who came yesterday, went home |
| 5  | to another state but is coming back tomorrow morning.  It |
| 6  | works. |
| 7  | MR. MARVINNY:  Thanks. |
| 8  | THE COURT:  We're here to impose the sentence in this |
| 9  | case.  By the way, thank you, as well, and welcome to the |
| 10 | members of Mx. Zelony-Mindell's family, friends and those who |
| 11 | are here today.  We're here to impose sentence in the case of |
| 12 | *United States v. Efrem Zelony-Mindell.*  On July 19, 2023, |
| 13 | Mx. Zelony-Mindell pled guilty to one count of distribution of |
| 14 | child pornography.  In preparation of today's proceeding, I |
| 15 | reviewed the plea agreement and the transcript of the plea |
| 16 | proceedings.  I've also reviewed the presentence report dated |
| 17 | October 5 including its recommendation and addendum.  I have |
| 18 | also received the following additional submissions:  First, the |
| 19 | defense's sentencing submission dated October 31, which |
| 20 | attaches various materials, including the psychiatric and |
| 21 | psychosocial report of Dr. Alexander Bardey, a report of |
| 22 | Federal Defender social worker Rachelle Veasley, various |
| 23 | letters in support from family and friends, and certificates |
| 24 | reflecting programs taken and courses taken at the MDC. |
| 25 | Second, I've reviewed the government's sentencing submission |

NBERZELs

1    dated November 7.

2              Have the parties received each of these submissions,

3    and has anything else been submitted in connection with this

4    sentencing?

5              MS. DANIELS:  The government has received the same

6    materials that the Court mentioned and the government is not

7    aware of any additional materials.

8              THE COURT:  Later on, I'll be asking about things like

9    forfeiture and restitution.  I take it there's not been a

10   proposed order submitted along those lines?

11             MS. DANIELS:  Correct.

12             THE COURT:  And same for you, Mr. Marvinny?

13             MR. MARVINNY:  Correct.

14             THE COURT:  Have you read the presentence report?

15             MR. MARVINNY:  Yes.

16             THE COURT:  Have you discussed it with your client?

17             MR. MARVINNY:  Yes.

18             THE COURT:  Mx. Zelony-Mindell, have you read the

19   presentence report?

20             MR. MARVINNY:  I have, your Honor.

21             THE COURT:  Have you discussed it with your counsel?

22             MR. MARVINNY:  Yes.

23             THE COURT:  Have you had the opportunity to go over

24   with him any errors in the report or anything else that should

25   be taken up with the Court?

NBERZELs

1          MR. MARVINNY:  Yes, your Honor.

2          THE COURT:  And Ms. Daniels, have you read the

3     presentence report?

4          MS. DANIELS:  Yes.

5          THE COURT:  Putting aside the calculation of the

6     sentencing guidelines, which we will get to, are there any

7     concerns about the report regarding its factual accuracy?

8          MS. DANIELS:  None from the government.

9          MR. MARVINNY:  Not from us, your Honor.

10         THE COURT:  Okay.  Hearing no objections, I will adopt

11    the factual recitations in presentence report.  The report will

12    be made a part of the record in this matter.  It will be placed

13    under seal.  In the event an appeal is taken, counsel, on

14    appeal, may have access to the sealed report without further

15    application to the Court.  Ordinarily, at this point, I ask

16    whether there's any reason why the parties' sentencing

17    submissions should not be publicly filed.  I think the better

18    way to formulate that here is there's clearly good reason,

19    sounding in medical and psychiatric confidentially, for

20    portions of this reports to be redacted, but subject to

21    justified redactions, is there any reason that they shouldn't

22    be publicly filed?

23         MS. DANIELS:  None that the government is aware of.

24         THE COURT:  And has yours been filed?

25         MS. DANIELS:  Yes.

NBERZELs

1          THE COURT:  I thought so.  Okay.  The same?

2          MR. MARVINNY:  No reason, your Honor.  We have

3     publicly filed a modestly redacted version.

4          THE COURT:  Very good.  All right.  Turning to the

5     sentencing guidelines, the Court is no longer required to

6     follow the sentencing guidelines, but I am required to consider

7     the applicable guidelines in imposing sentence.  To do so, it's

8     necessary that the Court accurately calculate the guidelines

9     sentencing range.  In this case, there was a plea agreement in

10    which the parties stipulated to a particular calculation of the

11    sentencing guidelines.

12         Counsel, am I correct that the calculation in the

13    presentence report is in accord with your agreement?

14         MS. DANIELS:  Yes.

15         MR. MARVINNY:  Yes.

16         THE COURT:  All right.  Then based on the parties'

17    agreement, the absence of objection, and my independent

18    evaluation of the guidelines, I accept the guideline

19    calculation in the presentence report.  I find, therefore, that

20    the offense level is 37, the criminal history category is I,

21    and the guideline range is between 210- and 262-months'

22    imprisonment.  I also find that there's a mandatory minimum

23    sentence, that I can't impose a sentence below, of 60-months'

24    imprisonment.

25         The next subject I need to cover is departures, which

NBERZELs

is to say that in the framework of the sentencing guidelines in
the plea agreement, both parties agree that neither an upward
nor downward departure, that is to say within the guidelines
framework, is merited.  Having reviewed the presentence report
and the parties' submission, I share the conclusion.  I find
that no departure is available as a matter of law.  Of course,
that does not preclude any party from seeking a variance from
the guideline range, and both parties in this case are seeking
a downward variance.

Having taken care of those necessary preliminaries,
does the government wish to be heard with respect to
sentencing?

MS. DANIELS:  Yes, your Honor.  This is a very serious
case, and the government has thought hard and carefully about
the appropriate sentence to recommend here.  The government has
concluded that a sentence of 120-months, both a significant
sentence and a significantly-below-guideline sentence, is
necessary here to account for the offense conduct, to promote
respect for the law and, crucially, to protect the public.  The
offense conduct here was particularly heinous and dangerous to
society's most vulnerable individuals, children.  The offense
conduct involved both the possession and distribution of child
pornography as well as the attempted enticement of a purported
nine-year-old child to engage in sexual activity.

First, beginning with the distribution and possession

NBERZELs

1     of child pornography here, this conduct was significant, and it

2     was initiated by the defendant with respect to the activity and

3     the communications with the undercover.  The defendant first

4     reached out to the first undercover agent on a messaging

5     application called --

6                THE COURT:  Just help me understand.  Essentially, I

7     appreciate there's no defense offered in this case of anything

8     like entrapment, but I was having difficulty understanding just

9     how the engagement got started.  What was it that was publicly

10    posted that I gather the defendant alerted to or responded to?

11               MS. DANIELS:  I understand that the defendant reached

12    out to an undercover agent with an account on a messaging

13    application called SCRUFF, and I understand that that

14    application is used, I believe, primarily in a dating context;

15    is that correct?

16               MR. DERAGON:  Correct.

17               MS. DANIELS:  With respect to men seeking

18    relationships with other men.

19               THE COURT:  As opposed to men seeking relationships

20    with children?

21               MS. DANIELS:  Correct.

22               THE COURT:  And what was the outward-facing presence

23    of the undercover, if you will?  What was that

24    advertising/seeking?

25               MS. DANIELS:  I understand that the profile indicated

NBERZELs

1    that the undercover was interested in taboo; taboo being a

2    shorthand or euphemism for activity with children, with minors.

3            THE COURT:  So in other words, the undercover puts

4    that out, and then Mx. Zelony-Mindell sees it and reaches out?

5            MS. DANIELS:  Yes.  The defendant, as I understand,

6    reached out to that account with that interest stated in taboo

7    and asked if the undercover was interested in taboo.  Once

8    learning from the undercover that the undercover purportedly

9    was interested in taboo, the defendant then asked the

10   undercover if he had a Telegram account, an encrypted account,

11   and suggested they move to Telegram.  Once communicating on

12   Telegram, the defendant quickly began exchanging child

13   pornography with that undercover.  It was within days, and

14   within days, the defendant even sent child pornography showing

15   an image of a toddler, an approximately four-year-old child,

16   being forced to perform oral sex on an adult male.  These

17   images included other horrifying images.  Images, for instance,

18   of an approximately 11-year-old child being penetrated anally.

19   In total, there were over approximately 2,900 images.

20           THE COURT:  And these are all going in the direction

21   of Mx. Zelony-Mindell to the undercover?

22           MS. DANIELS:  Yes.  With respect to the total number,

23   the 2,900 that I just mentioned, I want to make a clarification

24   to the government's sentencing submission in which the

25   government cited a portion of the defense submission stating

NBERZELs

1    that the total number of images was approximately 2,000 or over

2    2,000.  Now, importantly, that number is the total; whereas,

3    the number of unique images is 1,500, still an extremely

4    significant amount of child pornography.  And also, very, very

5    troubling is that 50 of those 1,500 unique images showed images

6    of toddlers, infants and BDSM.  The damage done to these

7    children --

8         THE COURT:  Pause for a moment on that.  I understand

9    it's undisputed that Mx. Zelony-Mindell did not himself

10   generate these images.  Is there any understanding where he got

11   them?

12        MS. DANIELS:  I recall from chats, in which the

13   defendant was participating with the undercover agents, that in

14   response to, I believe, questions from the undercover, the

15   defendant responded that he used to visit and participate in

16   chat rooms and had collected a trove -- my words not the

17   defendant's words -- a trove of child pornography.  I believe

18   the defendant's words were that he had a "shit ton" on his

19   phone.

20        THE COURT:  Thank you.

21        MS. DANIELS:  The harm done to these children is

22   significant.  It is concrete.  It is real lives.  It is done in

23   the making of the imagery, and it is also done, and that harm

24   is perpetuated, during the sharing of this imagery.  These

25   victims live their entire lives knowing that their worst

NBERZELs

moments are being relived, and not only that, but that

individuals, such as the defendant, are experiencing and

gaining pleasure from the worst moments of their lives, truly

living nightmares.

That alone, that conduct, requires a significant

sentence and one well above the mandatory minimum here, in

particular, to promote general deterrence with respect to the

law here to account for this serious, serious offense.  The

defendant's conduct did not stop with the distribution of child

pornography.  It extended also to have hands-on contact with

what he thought -- they thought, rather -- was an actual child.

The first undercover agent that I've mentioned relayed to the

defendant that the undercover had a friend with a nine-year-old

child and sent the defendant the contact information, the

Telegram information, for that other second undercover.

The defendant then contacted the second undercover

within minutes on Telegram.  They began communicating, and very

quickly, the defendant expressed a desire to meet and engage

with sexual activity with a nine-year-old.  During those

conversations, the undercover stated to the defendant that the

nine-year-old boy/child would be knocked out a little bit of

sleep medication to which the defendant responded, "Yeah

totally."  Shortly thereafter in approximately the month of

June, 2022, the defendant moved to Arkansas, but he kept

talking to the undercover.

NBERZELs

1          THE COURT:  Where had the defendant been originally?

2          MS. DANIELS:  The defendant was originally in New York

3     and then moved to Arkansas.  The defendant understood that the

4     undercover with the purported nine-year-old child lived in New

5     York and continued those conversations about meeting and

6     engaging with sexual activity with that nine-year-old.  Those

7     conversations continued for months.  On October 3 of 2022 the

8     defendant, in a conversation with the undercover, stated that

9     he was looking at the week of December 13 to 15 to come to New

10    York, and they continued to discuss how that might be a time

11    for the defendant to engage in a sexual activity with a

12    nine-year-old child.  This is months in advance.  The defendant

13    had months.  He had plenty of time to think about his planned

14    actions here, to think about the harm that he was intending for

15    this nine-year-old child, and then he followed through on it.

16         And then, he traveled to New York, and rather than

17    traveling to New York for his own purposes, I understand there

18    were medical appointments, he included in his plans and

19    purposefully made sure that this meeting would occur.  Indeed,

20    the day before, he messaged the undercover and stated, "I can't

21    wait to taste his sexy little nine-year-old penis."

22         On December 16, when the defendant showed up with the

23    arranged meeting where he thought he was going to meet the

24    undercover and then proceed to have sex with the nine-year-old

25    child, he was arrested, and, thankfully, no harm fell to any

NBERZELs

actual child.  But that is no credit to the defendant.  The

defendant's actions make clear that he intended to engage in

sexual activity with a nine-year-old child; that he had planned

it for months and was looking forward to it.

          This crime warrants an extremely serious punishment,

and, again, one well above the mandatory minimum sentence here.

The government recognizes that the defendant has accepted

responsibility, that the defendant has shown remorse, and that

the defendant has shown a willingness to cooperate, but none of

that detracts from the seriousness of the offense conduct here,

and the need for general deterrence, and for the Court to

communicate the very real harm to the most powerless,

vulnerable individuals in society is extremely serious and

warrants a serious sentence here, which is a significant part

of the government's recommendation for a sentence of

120-months.

          The need to protect the public also requires a very

significant sentence well above the mandatory minimum.  The

government, again, recognizes that the defendant has expressed

a desire to change, to seek help, and to participate in that

treatment.  And the government's sincere hope is that that

occurs, but that does not fully allay the concerns about the

danger to the community.  There are serious concerns that

remain.

          This individual has been diagnosed with pedophilia.

NBERZELs

But putting aside that diagnosis, as there are issues in the
expert report, which the government has highlighted in its
sentencing submission.  The defendant's own demonstrated
conduct shows a sexual interest in children as well as a
willingness to act on it.  And, again, these are issues that
the forensic reports from the defense expert did not address.
In addition to the conversations that I've highlighted so far,
I think one particular segment of conversation between the
defendant and the undercover is important here underscoring the
danger posed by this diagnosis of pedophilia as well as the
demonstrated interest in children and not only children but
toddlers -- but prepubescent children.

        In one conversation, a text message conversation, this
is USAO 0000504, which has been produced to the defense.  The
defendant, using the handle Evan, writes to the undercover,
"What is the youngest you'd fuck?"  The undercover responds,
"Hmmmm, honestly, Bro, maybe two, if I could.  What about you?"
The defendant responds, "Absolutely the same, dude.  My huge
cock in that perfect little body making him take all of it."
The undercover responded, "Slow or hard?"  The defendant
responded, "I definitely want him to cry."  The defendant
responded again, "Honestly, I think we both know we would go
hard and raw."  The undercover responded, "Fuck yes."  The
defendant responded, "There's no point fucking a little boy
with a condom."  This is talking about sexual activity, rape,

NBERZELs

of a two-year-old.  This conduct, these statements, this
demonstrated interest shows that notwithstanding any expert
report or any showing of remorse and acceptance of
responsibility, there are concerns that remain with respect to
protection of the public.  Again, it's society's most
vulnerable that need this protection, a very serious sentence
is warranted in order to do that and to achieve that goal of
sentencing.

        Before I conclude, I want to address a few points with
respect to avoiding disparities with respect to other sentences
in this district as well as how that might relate to criticisms
of the applicable guidelines here, of which I'm aware of the
Court's views.  For the reasons already stated in the
government's sentencing submission, the cases highlighted by
the defense in support of their recommended sentence of a
mandatory minimum sentence of five years ignore certain
distinguishing factors and circumstances.  Each sentence is a
unique sentence.  Each defendant is a unique defendant.  But
here, those selected and pointed to by the defense ignore a
number of factors including the absence of diagnoses of
pedophilia, the age of certain of the defendants, the absence
of intended victims who were prepubescent minors, the absence
of a huge collection of child pornography including images of
infants and toddlers, certain mental health and other
illnesses, different in kind from those present here, and in

NBERZELs

certain cases, conduct that involved possession or distribution of child pornography, but the absence of any attempted enticements, any attempted, actual hands-on contact.

The defendant's submission also ignored several cases where a body of cases in this district as well as the Eastern District of New York, which shows that indeed there's a wide range and there's a spectrum of which the government's recommendation of 120-months is well within.  For example, in attempted enticement cases, sentences range from under ten years to over 20 years with ten years on balance for certain cases that are similar and, again, similar on balance rather than similar as an exact match, as I noted that all defendants are unique and each case is different.

I would point, first, to *United States v. Jose Perez*, which was before your Honor 19-Cr.-297.  Here the defendant pleaded guilty to attempted receipt of child pornography as well as bail jumping.  There was a mandatory minimum of five years there, and I believe the guidelines were starting at 192 months.  The sentences imposed there, 120 months with 96 months specific to the attempted receipt of child pornography.  There the relevant conduct included that the defendant messaged with an undercover he thought was a twelve-year-old girl, tried to get him to create and send him pornography of herself, child pornography, and then the defendant showed up at a restaurant to meet her and was arrested there.  There were certain

NBERZELs

mitigating factor there, including that the defendant was 64
years old, had COPD, and other serious health conditions, and
there was an expert report finding that he was not, in fact, a
pedophile.  There were also certain aggravating factors.  The
criminal history, including decades-old convictions but
significant convictions for narcotics and robbery, including
significant sentences attached to those convictions, as well as
the bail jumping that occurred in that case.  There were
certain distinctions, of course, from this case, the absence of
any huge trove of child pornography, but on balance, I think
this is a sentence that I think is indicative of sentences
imposed in this district that show that, when balancing all the
factors at play, a sentence of 120 months is important and
warranted and well within the sentences imposed in this
district.

Another sentence is *U.S. v. Peter Bright*, 19-Cr.-521
before Judge Cronan.  Excuse me, Judge Castel.  Thank you.
Here the defendant was convicted at trial of attempted
enticement and sentenced to 144-months' imprisonment where
there was a ten-year mandatory minimum.  Here, the defendant
communicated with an undercover about meeting her purported
seven- and nine-year-old children to engage in sexual activity
and showed up to that meeting.  In that case, there was no
possession of child pornography at issue or distribution.
There was an expert report that found that there was no hint of

NBERZELs

pedophilic or deviant sexual behavior.  There was a counselor

who agreed with that diagnosis, and there was also a lifelong

history of severe depression in this that case.  Again, this is

another case where the factors on balance align with the

factors on balance here.

There are several other examples throughout the SDNY

and the EDNY showing that possession, receipt, transportation

of child pornography cases typically receive or may receive

between five and seven years.  For example, *United States v.*

*Francis Hughes*, 21-Cr.-584, before Judge Halpern here in the

Southern District*; U.S. v. John Cruz*, 15-Cr.-338, again, before

Judge Castel; *U.S v. Michael Wustrow,* 17-Cr.-87 in the Eastern

District before Judge Hurley; and *U.S. v. Zanco,* 18-Cr.-412

before Judge Bianco, also in the Eastern District.

Another category of offenses shows that recent

offenders for purely possession of child pornography, or

distribution, lands closer to ten years.  Here as an example,

*U.S. v. Lancelot Lutchman*, 18-Cr.-654, before Judge Crotty.

And then there's a category of cases where there's attempted

enticement or child pornography, possession/distribution, where

the offenders are repeat offenders, and those sentences are

nearly double what the government is seeking here.  Those range

up to 20-plus years' imprisonment, including *U.S. v. Michael*

*Irizarry*, 18-Cr.-05, before Judge Caproni, where a sentence was

imposed of 20-years' imprisonment for a similar offense of

NBERZELs

attempted enticement where the defendant had been previously
convicted of possession of child pornography.

As I mentioned, each defendant is different.  Each
sentence is different, but taking a look at the body of
sentences for conduct that is similar and related to the
conduct at issue here as well as considering each of the
sentencing factors, the offense conduct, the seriousness of it,
the need for protection of the public as well as the mitigating
factors as outlined in the defense submission, the government
submits that's a sentence of 120 months is appropriate here.

THE COURT:  Thank you.  Thank you, I should add, for a
superb sentencing submission and for a very thoughtful
presentation today.  I would just say that the recounting of
prior precedence is a valuable thing.  As a general
proposition, it's something that the defense tends to do a lot
more of and better of than the government, and I think, just as
a matter of helpful advocacy, in a case with troubling and
unusual facts, that exercise is valuable to the Court, so thank
you.

A couple of questions for you.  First, just some
housekeeping ones.  Is the government in agreement with the
probation department that the only special assessment that
should apply here is the $100 that the other higher ones don't
apply because the defendant is indigent?

MS. DANIELS:  Correct.  The other special assessments

NBERZELs

1    do apply; they are mandatory but for a finding of indigency.

2             THE COURT:  That's what I was trying to capture.  I

3    was struck by the absence of any victim impact statements.  And

4    very often in child pornography cases, the F.B.I. is able to

5    identify, at least for some of the images, who they trace back

6    to, whether it's the actual victim or a parent.  I take it none

7    of that happened here?

8             MS. DANIELS:  We're still in the process of that.  I

9    understand that the database and the unit that runs those

10   searches is quite backed up.  Step one of that process has

11   completed of identifying a series of images that are

12   identifiable and for which the government has information.

13   I'll defer to Special Agent Dergaon if any of that is

14   incorrect.  I believe step two is identifying specific victims

15   and through that process, their contact information.  Any

16   submissions with respect to victim impact and restitution

17   related is still ongoing.

18             THE COURT:  Okay.  I mean, the first point of asking

19   was really if there was going to be a perspective of a victim

20   offered.  And while I've had a number of cases involving child

21   pornography and can fairly extrapolate from the types of

22   statements that parents and children give in those cases, I

23   take it here, just because of the back-up, in practice, we just

24   don't have that here.

25             MS. DANIELS:  That's correct.

NBERZELs

1          THE COURT:  Okay.  As for restitution, I understand

2    you are seeking a 90-day delay, and I think I get it, the idea

3    is essentially, because of back-up, it's as yet unknown whether

4    within 90 days, you'll be able to identify a victim let alone

5    work up what the restitution analysis is.

6          MS. DANIELS:  Yes.

7          THE COURT:  So how long are you seeking then to make a

8    restitution submission?  That would be mid-February?

9          MS. DANIELS:  Yes, I believe the 90 days -- I can

10   calculate it.

11         THE COURT:  All right.  I'll ask Mr. Smallman to come

12   up with 90 days, but that's helpful.  Next question involves

13   the guidelines.  As to the child pornography guideline, it's

14   not me, it's the Second Circuit in *Dorvee*, which has thrown

15   that guideline under the bus and has basically said it's a

16   political construct that essentially reflexively yields a very,

17   very high number beyond that which might be justified in the

18   individual case.  The government here could have, I take it,

19   insisted, as a condition of the plea — whether it would have

20   been accepted or not is another story — to plead to the

21   enticement count.

22         MS. DANIELS:  Right.

23         THE COURT:  Had the enticement count been the subject

24   of the plea, what would the mandatory minimum have been?

25         MS. DANIELS:  Had the enticement been the only count?

NBERZELs

```
 1                THE COURT:  Correct.

 2                MS. DANIELS:  Then it would have been a ten-year

 3     minimum.

 4                THE COURT:  What was the reason for accepting a plea

 5     to the child pornography as opposed to insisting the enticement

 6     count?

 7                MS. DANIELS:  The government reviewed the defense

 8     mitigation submission detailing many of the mitigating factors,

 9     or all of the mitigating factors, that are now before the Court

10     in this sentencing as well.  There are significant mitigating

11     factors.  Though, again, they are balanced against extremely

12     significant conduct and a need for serious protection of the

13     public that is ongoing.  As the government is seeking a

14     sentence of -- the government made a determination, at the time

15     that that mitigation package was submitted, in light of that

16     presentation, that a plea to the distribution charge was

17     appropriate and was a resolution that the government would

18     accept.  With respect to currently --

19                THE COURT:  In other words, that the defense should

20     have the opportunity to seek a below ten-year sentence even

21     though the government's advocacy would stop at ten years?

22                MS. DANIELS:  Correct.

23                THE COURT:  Okay.  I tried to figure out what the

24     guideline would be if one discounted for the *Dorvee* problem.

25     And as I understand it, under the plea agreement, both parties
```

NBERZELs

1    agree that given the admission to the child enticement as

2    relevant conduct, you have two separate groups.  And because

3    the child enticement guideline group is higher but the two

4    yield relatively close offense levels, you add two levels to

5    the child enticement group.  If one operates on the assumption

6    that the child pornography group's offense level is unusually

7    high for the problem spotlighted in *Dorvee*, and just assume for

8    argument's sake that the group that was formulated by the child

9    pornography guideline would be more than nine levels less than

10   the enticement guideline; in effect, the overall offense level

11   in this case drops by two.  Because we added to --

12            MS. DANIELS:  Yes.

13            THE COURT:  Under the grouping rules you subtracted

14   two if you assume away the child pornography group.

15            MS. DANIELS:  Yes, I believe that's correct.

16            THE COURT:  So by my calculation, the guideline range

17   here would have been 168 to 210 months to correct maximally for

18   the *Dorvee* problem.  You can check my math, but I'm respectful

19   of the *Dorvee* critique.  But in this case, because the

20   guideline that predominantly drives the analysis is not subject

21   to that critique, the enticement guideline, it looks to me as

22   if the *Dorvee* correction gets you no lower of 168 to 210.  That

23   doesn't necessarily mean it is the measure of the just

24   sentence, but it eliminates the *Dorvee* critique; is that a fair

25   way of looking at the guideline dimension of this problem?

NBERZELs

1          MS. DANIELS:  I believe that's correct.  I haven't

2    independently calculated the guidelines in that way, but from

3    the Court's description, I believe that is correct and agree

4    that, as a substantive matter, there are distinctions from

5    *Dorvee*, as your Honor has mentioned, with respect to the

6    attempted enticement here.

7          THE COURT:  I confess, I didn't do a systematic

8    search, but I'm aware of case law that critiques the enticement

9    guideline in the way that the *Dorvee* decision very memorably

10   critiques the child pornography guideline.

11         MS. DANIELS:  Yes, I'm not aware either.

12         THE COURT:  Thank you.  Again, thank you for a superb

13   sentencing submission both today and in writing.

14         Okay.  Mr. Marvinny, I'm happy to hear from you.

15         MR. MARVINNY:  Thank you, your Honor.  There's a lot

16   to respond to with what the government said, but I maybe want

17   to start with one of the guideline questions that the Court

18   raised.  I agree, there's not case law directly criticizing the

19   enticement guideline, which is 2G1.3, to the same extent that

20   *Dorvee* criticized the child pornography guideline.  We did

21   attempt in our submission to deconstruct 2G1.3 a bit.  I do you

22   believe that it suffers from some of the very same problems

23   that the child pornography guideline suffers from identified in

24   *Dorvee*; namely, the guidelines base offense level has been

25   ratcheted upward over the years solely to reflect increasing

NBERZELs

mandatory minimums imposed on enticement offenses.  Enticement

offenses went from a zero to a five-year to a ten-year

mandatory minimum, and at each iteration, the guideline 2G1.3

similarly raised its base offense level just to reflect those

changes.  And that was one of the key criticisms of the child

pornography guideline in *Dorvee*.

THE COURT:  With respect, and I don't want to get into

a lot of guideline analysis, because the case ought to be

decided on other factors, but *Dorvee* has a range of other

problems.  The defendant could commit the distribution offense

in *Dorvee* through conduct that is little more than accessing

oneself but in a way that, sort of, by the way computers work,

tends to replicate copies of child pornography, and then when

that happens, in effect every upward enhancement is

automatically triggered.  Here, the notion is the base offense

level is very high, but it appears based on a normative

judgment by Congress, but one that is hard to disagree with,

which is that the conduct of enticement by its nature deserves

a very high base offense level.  It doesn't feel to me as if

the *Dorvee* critique, which is just a jerry-rigged guideline

that creates a lot of artificial upward enhancements that

automatically kick in, is a natural fit here.

MR. MARVINNY:  Right.  That is one -- maybe a

secondary or a coequal criticism in *Dorvee* of the guideline.

But, again, the point of the sentencing commission, kind of,

NBERZELs

not exercising its characteristic institutional role in
determining a just sentence and simply reflecting a directive
from Congress, that's equally true of 2G1.3, and that's a
criticism in *Kimbrough* for the crack cocaine guidelines, in
*Dorvee* for the child pornography guidelines --

THE COURT:  Okay.  Let me get to the substance.  If
the notion that the decider was more Congress than the
sentencing commission, I suppose the critical question is:
What is wrong with Congress' more or less categorical judgment
that crimes of this nature belong at a very high level?

MR. MARVINNY:  That's obviously a very fair question.
I don't know that I have the answer to that question.  There's
a larger critique of mandatory minimum sentences writ large.

THE COURT:  That I get, yes.  That's a different
issue.

MR. MARVINNY:  This would certainly fall into it.
Again, if we're trying to use a guideline as a mechanism for
arriving at a just sentence, what the Second Circuit and the
Supreme Court said is if the sentencing commission didn't
determine that the sentence is based on national data, past
practices, comparison of similar cases, then the guideline is
just a poor mechanism.  It may not be incorrect at the bottom,
and the Court may agree with Congress' mandatory minimums in
the particular offense, but the guideline itself lacks as much
validity as one that the sentencing commission has arrived at

NBERZELs

1    from empirical data.

2            THE COURT:  Point taken.  Thank you.

3            MR. MARVINNY:  But you are right, your Honor.  The

4    guidelines are just one factor in this case like any other

5    case.  What I wanted to emphasize to the Court, much more

6    important than the guidelines analysis, is that no one disputes

7    the gravity of the offense here, the seriousness of it, the

8    moral repugnancy of the offense, no one including Efrem

9    Zelony-Mindell.  I'll speak more about that in a moment, but we

10   acknowledged that at the outset, and we would be remiss not to

11   acknowledge the conduct is disturbing.  I think our submission

12   adequately conveys that.  I think Mx. Zelony-Mindell 's letter

13   accurately conveys, and I think Dr. Bardey's report adequately

14   takes account of that fact, and I will speak more about that as

15   well.

16           But I do want to start, your Honor, with the fact that

17   Mx. Zelony-Mindell truly does display a remarkable degree of

18   insight, remorse and acceptance of responsibility.  For better

19   or worse, it is not every defendant accused of these crimes

20   that does so and certainly not to the extent that

21   Mx. Zelony-Mindell has.  And, your Honor, this isn't just

22   something convenient for our sentencing submission that we want

23   to be able to stand up here and say this to the Court at the

24   last minute.  This was true from the moment that they were

25   arrested.  The government acknowledges this.  Agent Deragon,

NBERZELs

who was one of the interrogators of Mx. Zelony-Mindell, is in

court today.  From the moment of their arrest, they were

ashamed, remorseful.  They said, both during their interview

and to Dr. Bardey, that in some sense they expected that they

would be arrested and that that was the appropriate thing

because what they had done was so shameful.  They immediately

cooperated with law enforcement.  They volunteered, your Honor,

that they had a second cell phone back at an apartment in

Brooklyn where they had been staying, and that cell phone

contained the vast majority of child pornography here.  So when

the government talks about the 1,500 unique images, which we

don't dispute in my way, a large number of that was on the

second phone that was volunteered by Mx. Zelony-Mindell.  They

also volunteered their passcodes and gave the agents permission

to go through their phones and assume their social media

accounts.  That was from essentially minute one after their

arrest.

THE COURT:  Prior to defense counsel being appointed?

MR. MARVINNY:  Absolutely correct, your Honor, prior

to defense counsel getting involved.  It's continued through.

Mx. Zelony-Mindell 's father is here.  I know he has had

extensive conversations with Efrem, our social worker has, I

have.  The level of remorse palpitates off of Efrem.  It's

tangible when you are in the room with them.  I don't think

that should be overlooked.  In terms of are they going to

NBERZELs

1    reoffend?  Are they a danger?  That is a significant factor

2    that is just not present in every case.  The government

3    identified --

4            THE COURT:  Pause on that for a moment.  I appreciate

5    that Dr. Bardey finds a limited risk of recidivism, not zero

6    but low.  I hope that's true.  How reliable is that?  I mean,

7    we do have, in this case, a defendant whose conduct brings him

8    literally to the brink of sexual conduct with a nine-year-old.

9    Why is it safe to assume that with the intervention of

10   Dr. Bardey, with the fact of the arrest, why is it safe to

11   assume that if at liberty again and with access to electronics

12   again, something like this wouldn't happen again or couldn't

13   happen again?

14           MR. MARVINNY:  I certainly can't say it couldn't

15   happen again, and I can't even say it wouldn't with 100 percent

16   certainty.  But I think why the Court could have reasonable

17   assurance is Dr. Bardey did find, in part -- well, for a couple

18   reasons.  One, Mx. Zelony-Mindell had no prior criminal

19   history, certainly, and no prior actual real world sexual

20   contact, sexual activity, with a minor or with a child.  And

21   they are in the mid-30s now, and this is a very first offense.

22   Dr. Bardey found that significant.

23           Second, as Dr. Bardey says, Efrem exhibits no

24   psychopathic features, no antisocial behavioral tendencies.

25   They are, in many ways, although they have a history of mental

NBERZELs

1   illness that factor into the offense, a relatively

2   well-adjusted person.

3           Third, the pedophilic disorder, which the government

4   makes a lot of that was found by Dr. Bardey, was based

5   primarily on the offense conduct.  The testing, the Abel

6   testing and the other objective tests at issue, determined that

7   Efrem, primarily sexually attracted to adults, has a secondary

8   interest in 14 to 17 year olds.  And so when Dr. Bardey found

9   that Efrem has pedophilic disorder, it was of a non-exclusive

10  type, which sets them apart from other people with that

11  disorder; meaning that, in fact, the primary interest sexually

12  is in adults.  And that's reflected, again, in the fact that

13  there's been no contact offense prior to this, that Efrem has

14  had relationships with only age-appropriate men throughout --

15          THE COURT:  What do you make, though, of the

16  communications that AUSA Daniels summarized which seemed to

17  describe somewhat durably an interest in much, much younger

18  children?

19          MR. MARVINNY:  First of all, I don't belittle anything

20  that was said.  It's difficult to listen to.  I think in every

21  comparison case that we've been talking about, I think the

22  government could go through and these chats are exceptionally

23  salacious.  Efrem participated in something that is known as

24  age play.  We haven't made a ton of it, but it was evident

25  throughout their chats with the undercover.  It's reflected in

NBERZELs

1    Dr. Bardey's report, and it's a well-recognized activity.   And

2    what that is is two grownups talking to each other about sexual

3    activity with minors or with children in a way that arouses

4    them.   It doesn't necessarily mean there's going to be any

5    contact offense, and age play is something that Efrem --

6            THE COURT:  And I get that that is a thing.   The

7    problem is he shows up with lubricant to a meeting with a

8    nine-year-old.  And so, that is a telling fact that suggests

9    we're well past playacting.

10           MR. MARVINNY:  Yes, your Honor, for sure.  No, we've

11   acknowledged that that conduct is there.   That conduct is there

12   in every one of the cases I've cited as well.   And I'll talk

13   more about those cases in a minute.   The government wants to

14   say they are not really opposite.   They are.

15           But that conduct is concerning, and it merits the

16   five-year sentence.   It merits incapacitation.   But the

17   question is how much incapacitation?  How much punishment is

18   enough?  And, again, Dr. Bardey, acknowledging that conduct,

19   made certain diagnoses but also said that Efrem presents a low

20   risk of violence, danger and recidivism and is amenable to

21   treatment, and there is treatment available.

22           Getting back to my original point of the kind of

23   uncommon sense of responsibility and remorse, Efrem is

24   literally dying participate in this treatment to a degree that

25   is really commendable.   As the Court knows, in our submission,

NBERZELs

1  we've asked that Efrem be designated to what is called a SOMP,

2  S-O-M-P, which is a Sex Offender Management Program in the

3  Bureau of Prisons.  This would be a program that is essentially

4  dedicated to people with similar charges to Efrem and for

5  people who want to do the work to make themselves better.  And

6  Efrem is anxious to participate --

7          THE COURT:  You are recommending Petersburg?

8          MR. MARVINNY:  We are asking the Court to recommend a

9  designation to Petersburg.

10          THE COURT:  During my second month on the job, when

11  they take new judges to a federal prison, that happened to be

12  where my group of new judges for training was taken to, and I

13  was impressed by significant aspects of the facility.

14          MR. MARVINNY:  I appreciate that, your Honor.  Because

15  we have thought long and hard about the recommendation in this

16  case.  And to Efrem's credit, they want the treatment.  And

17  this is also reflected in work they've done with Ms. Veasley,

18  who is the director of our social work program, they've met

19  over 30 times.  She's on maternity level, but if she were here,

20  she would tell of the level of commitment to getting better

21  Efrem has.  It is genuine.  That's all I can say.  I hope you

22  saw it Efrem's letter to you, and you'll hear it today when

23  Efrem is given a chance to speak.

24          So all of those things, just to recap very briefly,

25  the lack of psychopathic features, the lack of prior criminal

NBERZELs

1    history, the lack of any real world sexual conduct with a

2    minor, the cooperation with law enforcement, the amenability

3    and desire for treatment, and why I think the Court can take

4    some solace in Dr. Bardey's claim that Efrem has a low risk of

5    recidivism.  It's certainly worth taking a chance and giving a

6    sentence of five years with some period of supervised release,

7    which is, of course, mandatory and which the Court can

8    determine the appropriate length and allow Efrem to do

9    treatment work both inside and outside of prison walls.

10          Your Honor, again, there was a lot in what the

11   government said.  I do want to talk about the comparison cases

12   that we've cited in the submission.  Of course, any case is

13   distinguishable from any other.  There are no two cases that

14   are identical in any respect, but the seven cases that we've

15   cited are absolutely the closest that we could find to the

16   situation at issue here.  They are as close to as on all fours

17   as possible.  There are distinctions between them, of course,

18   but in the aggregate, they represent the constellation of

19   factors that is present here.  Defendant is caught in a sting.

20   They are permitted to plead down to the lesser offense than the

21   enticement offense.  Defendants who by and large possessed

22   childing pornography, not everyone of them did -- Ms. Daniels

23   is right, the vast majority of them did -- and who were given

24   sentences well below the guidelines range.  We've talked a lot

25   about the guidelines.  I mentioned this in our submission.

NBERZELs

1   Efrem's guidelines are only higher than those defendants, and
2   marginally so, they are only higher because the government
3   insisted, as is their right, that Efrem agreed that the
4   enticement guideline and enticement offense qualify as relevant
5   conduct under the guidelines.  That has the impact of actually
6   elevating their offense level.
7           THE COURT:  But it also has the -- the plea agreement
8   also had the effect of giving you the opportunity to make the
9   argument you are making here today.  Had the government said,
10  all right, we'll choose the enticement rather than child
11  pornography guideline, you would be here with a mandatory
12  minimum floor of ten years.  It's hard to critique what the
13  government has done is, in some sense, a decision that
14  heightens your client's exposure.  It was, by another light, a
15  Solomonic way of giving you the opportunity to make this
16  argument while making sure that your client, not only from a
17  factual perspective but from a guidelines perspective at least,
18  was accountable for both categories of conduct.
19          MR. MARVINNY:  Agreed, your Honor.  We were thankful
20  for the plea offer.  I'm not faulting the government at all.
21  I'm simply saying that, in looking at those comparison cases,
22  those defendants, despite having engaged in the same conduct,
23  did not have to accept that guideline.  As Ms. Daniels, I'm
24  sure, will confirm, because we had the conversation with her
25  office, this is essentially a new policy at the U.S. Attorney's

NBERZELs

1    Office that certain guidelines pertaining to relevant conduct

2    would be included in the plea agreement, and, therefore, the

3    guidelines calculation.  My point is simply that in those

4    comparison cases, the guidelines would have been identical to

5    Efrem's if that policy had been in place.  They pled guilty

6    under a different regime.

7         And so, Ms. Daniels pointed to a whole other category

8    of cases, and the Court found that helpful.  I appreciate that.

9    I'm not prepared to rebut all of them.  I know there are

10   certainly differences in those cases.  You know, Ms. Daniels

11   cited the *Bright* case.  That was a case handled by my office.

12   I believe she noted that was a defendant that went to trial and

13   testified and was convicted of enticement, and Judge Castel

14   found, as part of the basis for his sentence, that the

15   defendant had lied on the stand.  There's a host of

16   differences.  I'm not equipped -- I'm unable to respond to

17   everything, all the new cases Ms. Daniels raised today in

18   court.  I know there are straight cites in possession of child

19   pornography cases where many Courts in this district, including

20   in some of my own clients, imposed no jail time as the all.  I

21   could have offered some of those as well.

22        THE COURT:  Well, look, the enticement offense here is

23   at least as serious as the child pornography offense here.

24        MR. MARVINNY:  Yes.

25        THE COURT:  And I'm not seeing any enticement case

NBERZELs

1    that goes below the sentence you are recommending, and I see

2    many that go above and materially above.

3            MR. MARVINNY:  But the cases we cite in our submission

4    here involve sentences below five years, and those are

5    defendants engaging in identical conduct.  There's a sentence

6    of 48 months.  There's a sentence of 30, and the average of

7    those cases is 60 months.  That's what I am saying.  That is

8    really the conduct and the posture of those cases; it is,

9    again, on all fours here.

10           THE COURT:  May I ask you, look, as you can tell, the

11   extent to which the conduct here came close to, from the

12   defendant's perspective, actual sexual contact; how much does

13   that track the cases you've cited?

14           MR. MARVINNY:  100 percent.  I mean, these

15   defendants -- I could go one by one -- almost all of them were

16   arrested at the predetermined meeting location with money,

17   condoms, or gifts in their hand.  It's almost one to one.

18   There might be one of the seven where the defendant was

19   arrested before they got to the meeting but not much more than

20   that.  They really -- I'm not going to put my own credibility

21   at issue, but these are not a cherry-picked selection.  These

22   are really factually -- they are not identical but they are

23   close.  I'm hoping Efrem receives treatment similar to what

24   those defendants have received, and we think it's important to

25   consider that.  But, again, every case is different.

NBERZELs

```
 1          What I can tell you about Efrem is what I've already
 2     said, which was that they acknowledge the seriousness of the
 3     offense more than anyone.  They're ashamed of what they did and
 4     they are ready to get better and to do what they need to do.  I
 5     will finish by saying Efrem's family is in attendance.  You
 6     acknowledged them at the beginning.  Efrem's father in
 7     particular is here.  Efrem, when eventually they are released,
 8     wants to go back to Florida live with their father and their
 9     father's partner, care for them, and continue whatever
10     treatment they've begun at the Bureau of Prisons.  I know it's
11     a serious case, your Honor.  I would never say otherwise.  We
12     ask you to impose a sentence that allows that to happen as soon
13     as is reasonably possible.
14          THE COURT:  Thank you, Mr. Marvinny.  I should say to
15     you that I thought your sentencing submission was absolutely
16     first rate, and I also particularly appreciated Dr. Bardey's
17     report and Ms. Veasley's.  It was a thoughtful and insightful
18     sentencing submission made all the stronger by the letter from
19     your client and the letters from those who know him best.
20          MR. MARVINNY:  Thank you, your Honor.
21          THE COURT:  With that, Mx. Zelony-Mindell, I'd be
22     delighted to hear from you.
23          THE DEFENDANT:  Thank you, your Honor.
24          THE COURT:  I see you are going to be reading, which
25     is normal, just read slowly for the benefit of the court
```

NBERZELs

1   reporter.

2               THE DEFENDANT:  Thank you, your Honor.

3               Judge Engelmayer, I tried to speak to you from my

4   heart in my letter to you.  I just wanted to explain a little

5   bit more.  I'm so sorry for re-victimizing the children, for

6   the disturbing and appalling pictures and videos I had in my

7   possession.  This reality is made more disturbing when I agreed

8   to meet with a nine-year-old for sex.  This is immoral and

9   deeply deplorable.  Judge Engelmayer, I take full

10  responsibility for my behavior and for my actions.

11              I can't begin to express how sorry I am.  I am

12  devastated by my behavior, sir.  Your Honor, to the extent that

13  my words mean anything to you, you and no judge will ever see

14  me in a court again.  I will never possess child pornography

15  and I will never engage in sexual conversations with others

16  about children, and I certainly will never harm any child.

17  These things are nightmarish.

18              I want to dedicate myself to my recovery and to

19  rebuilding my life.  I look forward to therapy, including sex

20  offender treatment, during and after the service of my

21  sentence.  I look forward to spending time with my father,

22  Charles, and his partner, Julie.  I want to be a law-abiding

23  citizen and stay out of trouble, sir.  This experience has

24  changed me.  I recognize the things I was taking for granted

25  and abusing, and I have a new drive to appreciate my family and

NBERZELs

freedom.  I'm motivated to be a caring and productive person.

I know I have a lot of work to do on myself.  I need to focus

both on who I am and the person I want to be in the future.  I

will work every day to be a better person, your Honor.  Thank

you for your consideration.

        THE COURT:  All right.  Thank you, Mx. Zelony-Mindell.

All right.  I'm going to take 20 minutes and assess the just

sentence here.  I'll be back in 20 minutes to address the

sentence.  Thank you.

        (Recess)

        THE COURT:  Under the Supreme Court's decision in

*Booker* and the cases that have followed it, the guideline

range, of course, is only one factor that a court must consider

in deciding the appropriate sentence.  A court must also

consider the other factors set forth in the sentencing statute

Title 18, United States Code, Section 3553(a).  These factors

include the nature and circumstances of the offense and the

history and characteristics of the defendant, the need for the

sentence imposed to reflect the seriousness of the offense, to

promote respect for the law and to provide just punishment.

The need for the sentence imposed to afford adequate deterrence

to criminal conduct, the need for the sentence imposed to

protect the public from further crimes of defendant, and the

need for the sentence imposed to provide the defendant with

needed educational or vocational training, medical care or

NBERZELs

other correctional treatment in the most effective manner.  The

Court must also avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty of

similar conduct.  And as a result, I've attempted to

familiarize myself broadly with the patterns of sentence in

this area to make sure that the sentence imposed here is

broadly consistent with those patterns.  The Court is also

required to impose a sentence sufficient, but no greater than

necessary, to comply with the purposes I have just reviewed.

And here I find that the sentence I'm about to pronounce is

sufficient, but not greater than necessary, to satisfy the

purposes of sentencing that I've just reviewed.

Mx. Zelony-Mindell, I've given a lot of thought and

attention to the just and appropriate sentence in your case in

light of those Section 3553(a) factors and really the purposes

for which sentences are imposed.  These are my thoughts, and

forgive me, this is going take a few minutes, but this a

complicated problem.  At the outset, I just want to say this:

The 3553(a) factors applied to your conduct and your personal

background are really predominantly what matters here.  Those

are really the drivers, but I'm going to say a few words about

the guidelines.

I've considered the guidelines recommendation here as

I'm required to.  As the defense rightly notes, the Second

Circuit in *Dorvee* has specifically criticized the child

NBERZELs

pornography guideline as methodologically flawed.  Following
the Circuit's lead, I discount the guideline recommendation
here to the extent it's driven by that guideline for the
reasons stated in *Dorvee*.  In the context of this case,
however, that exercise still leaves a very high advisory
guideline range, and that's because the main driver of the
guideline recommendation here in this case is not
Mx. Zelony-Mindell's conduct relating to the distribution of
child pornography but the separate group of conduct relating to
using a computer to induce a minor to engage in prohibited
sexual conduct.  That conduct which formed the basis of Count
Three, which had charged the attempted enticement of a minor,
is evaluated under guideline section 2G1.3.  And for the most
part, subject to the valid point that Mr. Marvinny raised, that
guideline is really not subject to nearly the same effective
methodological critique as the child pornography's distribution
guideline.  It yields a higher offense level in Rule 38 than
the one that the child pornography would.  And under the
grouping rules, the child pornography conduct does no more than
add two levels to that level 38 that was generated by the
enticement guideline.

          The bottom line is:  The child pornography conduct
simply adds two, from 38 to 40, to the offense level.  After
which, one substracts three levels for acceptance of
responsibility.  Here is the point:  If you remove the child

NBERZELs

pornography conduct from the equation altogether, the ultimate

advisory guideline range would still be formulated by a net

level 35 and would be 168- to 210-months' imprisonment.  The

bottom line is that the guidelines here, even getting rid of a

child pornography conduct, would recommend a long sentence, and

it is morally and normatively impossible, in my judgment, to

fault a guideline for treating that offense, specifically,

enticement of a minor for sex, as warranting a very high

sentence.

All right.  Turning in any event to the important

things, the 3553(a) factors.  The first set of factors requires

me to consider the seriousness of the offense, the need for

just punishment, and the need for the sentence to promote

respect for the law.  In other words, the sentence has to fit

the crime, and Mx. Zelony-Mindell, your offense conduct here,

as you know, was terribly serious.  One part of it involved

accessing and distributing to others over the internet child

pornography photographs, videos and stills, which were explicit

vile and exploitative.  They involved penetration, restraint,

rape, and compelled engagement in sex acts and sexual

stimulation by children, including little children, 4 years

old, 8 years old, 10 years old, 11 years old, 12 years old.  I

fully understand that you did not create those materials, and I

fully understand that, unlike in some previous cases, the

victims or the family members have not been identified and have

NBERZELs

1    not submitted victim impact statements.  But I've had other

2    cases of this nature, and I've been told repeatedly from the

3    perspective of the victims that the distribution and the

4    redistribution of these materials works, each time, a new

5    injury on them.  Each time a new person, even if now an adult,

6    has new pornographic photos and videos of them disseminated to

7    new people, it's experienced as a new offense, as a new act of

8    exploitation.  As Ms. Daniels quite rightly noted, for the

9    victims, the distribution of these materials makes them relive,

10   each time, the worst moment in their lives, and, you know,

11   barring some miracle under which somehow these could be deleted

12   from internet commerce, that's a price they will pay for the

13   rest of their lives.

14        You participated in that, Mx. Zelony-Mindell.  You not

15   only accessed and reviewed a vast amount of these materials,

16   you forwarded some of them to others, each time, again,

17   visiting harm on the victim and enabling yet a new person to

18   forward them on to yet new perpetrators.  You had to

19   appreciate, as you've told me you did, that this was wrong and

20   exploitive.  The guideline that applies to this conduct happens

21   to be badly constructed, but any sensible assessment would have

22   to view this conduct as terribly serious.

23        And the second part of your offense conduct, in my

24   assessment, was even more serious.  You sent child pornography

25   stills and videos to a person you understood to be the father

NBERZELs

of a nine-year-old boy.  You expressed an interest in having

sex with the boy in the presence of his father.  In an extended

series of emails spanning months, you were explicit and

enthusiastic about the acts you were going to engage in with

the child.  You approved of the idea that the boy would have

sleep medication during the act.  It doesn't mitigate things

that you had other noncriminal business to do in New York.

Your actions leave little room for doubt that you intended to

follow through on the plan.  You traveled to New York.  You met

up with the person you believed to be a father.  You brought

lubricant with you, which is a terribly damning fact here,

confirming that your intentions were real.  This conduct was

horribly exploitative.  It so happened that this was a sting

operation.  You didn't know that.  You were ready, willing and

able and equipped with supplies for a forcible, sexual

encounter with a partly tranquilized nine-year-old boy that had

the capacity and had every possibility of damaging him,

scarring him for the rest of his life, and potentially setting

him off on a life where he would take the abuse that you

visited on him and visit on a new generation of people.

Okay.  Switching gears, under 3553(a), I'm also to

consider the interest in what is called general deterrence, and

that refers to the need for the sentence I impose to send a

message to other people that is sufficient to deter them from

engaging in similar crimes.  Both of these crimes occur with

NBERZELs

1   disturbing frequency in this district and around the country.

2   And it's important, for obvious reasons, that cases involving

3   child pornography and child sexual enticement cases get

4   prosecuted and that the sentences imposed in those cases be

5   sufficient in the aggregate to send a message to anybody

6   thinking about following your lead.  The message has to be

7   don't go there, don't engage in such conduct, or you are

8   risking a significant prison term.

9           Under Section 3553(a), I have to consider as well a

10   different type of deterrence called specific deterrence, and

11   that refers to the need for the sentence I impose in your case

12   to send a message to you that is sufficient to deter you from

13   committing future crimes.  The report from Dr. Bardey opines

14   that you present a limited risk of committing a sex offense

15   against a child.  There's is no force to that in that I

16   recognize that before this case, there's no evidence that you

17   had ever engaged with a sexual with a child.  Although, the

18   record does indicate a step but ultimately unconsummated in

19   that direction.  And I credit that after proper treatment, it

20   may well prove that you have eliminated or seriously reduced

21   that impulse within you, and I credit, too, that you are

22   commendably eager to get going on that treatment.  That's all

23   good.  But this case is a far cry from one in which a

24   defendant's conduct was limited to just viewing child

25   pornography, and a wall could be put up between the offense

NBERZELs

conduct and the very different offense conduct of contact with
a child.

In child porn alone cases, it's more convincing to
contend that the defendant's sexual interest in children was a
voyeur and did not extend to actual sexual activity.  Not so
here.  Your conduct, your actions went beyond immersing
yourself in child pornography even discussing the possibility
of actual sexual conduct.  In this case, you communicated for
months with what you believed to be a nine-year-old's father.
You came to New York with equipment to meet with the child.
All the while, you were describing graphically the sexual
activity you intended to force the child to engage in.  And
when you met downtown with the father, from your perspective
minutes or hours away from meeting the child, again, you
brought lubricant with you.  Actions speak louder than word.
This case defines the point.  I appreciate how deeply and I
have no doubt how sincerely you regret your conduct, but I
can't find today that you pose zero threat or close of trying
to induce a minor to have sex with you.  And I can't find that
you pose no threat today, if given the opportunity, of again
re-accessing child pornography.  I, therefore, find, at this
moment in time, a continued interest in specific deterrence.
Until you have beaten back, until you have defeated the inner
demons that led you to commit these crimes, and hopefully you
will do that, the threat of a new prosecution has a role to

NBERZELs

play in deterring you from straying again.

That said, I do find Dr. Bardey persuasive that this is not a permanent condition.  I credit him insofar as he states that you are capable with the help of professionals of silencing the demons that led to you this bad place.  He credits you with self-awareness and with making very serious effort and very real forward progress even within the confines of the MDC to embrace the struggle and to work through the issues you have.  I was similarly very, very impressed by that to a degree that is quite unusual in cases of this nature.  You are determined and you are gifted and you are smart and you appear to be committed to turning your life around.  And so while I'm constrained to find an interest in specific deterrence today when you are still in the shadow of these abhorrent offenses, I also find that this is not a permanent condition.  You have the capacity to grow and change and get better.  And so, as central conditions of the supervised release term that I'll be imposing, I'm going to be requiring that you get access to the mental health and psychiatric treatment that you need, and I'll, of course, be recommending as well the Petersburg prison, which, within the important limitation that we're talking about, the federal prison system, is the facility that is most likely to get you the help you need.

Finally, under Section 3553(a), before turning to

NBERZELs

factors that point in a different direction, I have to consider
the interest in what is called incapacitation for public
protection.  That interest refers to the benefit that the
public gets from your being in a place, prison, where, by
definition, you can't hurt other people whether by accessing
child pornography or potentially making contact with a child.
For the same reason I have covered with specific deterrence,
there is a public interest today, right now, in your being in a
place where you don't have access to children or child porn,
but for the same reasons I just covered, you have it within
your grasp by engaging the therapy to reduce and, I hope,
eliminate the risk that you pose.  Now, I'm about to switch
gears.

        I have considered factors that by their nature tend to
favor a long sentence, and all of them do here, particularly,
the first set relating to the gravity of the offense.  But
there are other factors that favor you in the sentencing
equation, and I want to review them with you now.  First off,
you accepted responsibility.  You did that by pleading guilty.
You did that by admitting your crime.  You did it, in fact, by
admitting your crime basically immediately and by consenting to
give law enforcement access to what amounted to incriminating
materials about you.  Again, actions speak louder than words.
That is action that goes to your benefit.  Were it not for the
guilty plea, please know that the sentence I would be imposing

today would have been higher.

The letter you wrote to me, I thought, took ownership of your crimes to an unusual extent.  You dug into, really admirably, your history and to the struggles you have had.  You tried to explain how you got to the place where these crimes came about.  You apologized to your victims and their families.  Among the other things you wrote, "My trepidation is because I wish to express to you in a meaningful way how truly sorry I am.  I am sorry for re-victimizing the children in the disturbing and appalling pictures and videos I had in my possession.  I knew then, as I know now, how wrong I was to participate in the perpetuation of their trauma.  Yet, I consumed child pornography in earnest.  There is no excuse."  You go on in that vein.  You've described how the various unresolved emotional issues you had, how they grew during the pandemic and set the stage for this offense.  You go on to say, "I want to be clear, I don't mean to blame anyone or anything but myself for my immoral and reprehensible actions."  You forgive your mother -- I'll get to that in a moment -- which I thought was above and beyond, and you describe how your awareness of your character traits and issues is at a far different level of depth than it has ever been.  And you promised to me that child porn and drugs and so forth will never be an outlet for you again, and you express the desire to do the work necessary to get you to a better place.

NBERZELs

1        I often receive letters from defendants apologizing

2    for their crimes.  It's more common than not.  Your letter was

3    really unusual.  Its introspection and self-awareness were

4    simply just on a different magnitude, and I give you a lot of

5    credit for that.  That's a huge early step forward.  I

6    appreciated as well today what I thought was a very sincere

7    statement to me and, again, a very self-aware one.

8        Second, under Section 3553(a), I'm to consider a

9    defendant's history and characteristics.  From Dr. Bardey's

10   report and Ms. Veasley's letter and from the thoughtful letters

11   that I received about you from your family and friends, and,

12   again, from the characteristically insightful sentencing

13   submission I received from Mr. Marvinny, I learned about other

14   sides of you.  And I got, I think, a better understanding of

15   the turmoil that you received in your early life.  The people

16   that know you best believes that the root of your turbulence as

17   an adult.  I'll say that the materials strike a shockingly

18   harsh and cold and distant mother, who was ungracious and

19   vindictive to your father and you until abandoning the two of

20   you completely years ago.  I am so sorry.  I was horrified to

21   read that, and I'm so sorry you had to go through that.  And

22   how tragic that a relationship with a mother, which should be a

23   beautiful thing, became a nightmare for which you are still

24   today paying a heavy price.  Your mother apparently had her

25   struggles as a child of Holocaust survivors, but nothing

NBERZELs

1  excuses a mother for behaving that way towards a child.  Just

2  as, I think, you recognize, no abuse of by your mother can

3  excuse your taking advantage of children and paying that bad

4  thing forward.

5          The letters also describe that notwithstanding that

6  pain and notwithstanding your retreat to the heavy use of

7  marijuana and other drugs as an escape, you remained gracious

8  towards the people who knew you best.  And the people who

9  describe you, also describe very considerable personal gifts,

10 both personal and creative, on your part.  I want to read aloud

11 a few of the excerpts from the letters I received that struck

12 me.

13          I want to begin why your father, Charles.  He is here.

14 Thank you for the really thoughtful letter that you wrote.  It

15 really registered with me, and I can only imagine how hard that

16 was.  I also want to applaud you for being in the arena and

17 being by your son's side for the good and the bad and during

18 the journey that sounds like it had a lot of horrible parts.

19 "From the beginning, Efrem has been nothing but remorseful and

20 has always said that they want to do everything they can to

21 make amends.  What I feel for Efrem is empathy because I know

22 how much remorse they feel for what they did and how much pain

23 they're in."  Skipping a few paragraphs.  "Efrem was a good

24 kid.  From an early age, they had a strong sense of justice and

25 would befriend everyone from rich kids, poor kids and

NBERZELs

especially gravitated towards the needy kids.  Efrem stood up

for his peers..." and goes on with examples.  "I hope you can

see that Efrem has a good heart despite what they have done."

And he describes, as a result of this situation with your

mother, that part of you, he says, has always been missing, and

he says he loves you dearly.  It's a beautiful letter, a

tribute by a father.

From your father's partner Juliann; is she here?

Thank you for the beautiful letter that you wrote.  She writes,

"Despite all these challenges, Efrem strove continuously to

become an ardent advocate for the marginalized, LGBTQ, women,

people of color.  They were a frequent guests on radio and

podcasts where they tried to be a voice for those who couldn't

speak.  They worked diligently to get a venue for the artwork

of lesser known artists, especially those of color."  Skipping

a paragraph or two.  "I've only known them to be sensitive and

gentle, never prone to violence even when angry."

From your childhood best friend, Dare Lilly.  Is Dare

Lilly here?  No.  Okay.  "We stayed close and told each other

about our family histories and realized that we had similar

experiences.  Efrem and I both discussed having difficult

childhoods.  We remained extremely close when we went on to

college.  Our connection," he says, "has been a constant in my

life.  I know in my heart Efrem would never hurt another human

being.  I know how incredibly devastated they are to end up in

NBERZELs

1    this situation."

2         From your friend and colleague, Shane Rocheleau; is

3    Shane here?  Okay.  "Efrem listens," Shane writes, "when I've

4    had personal difficulties.  They are open, vulnerable and

5    attentive, and as I've continued my correspondence with them

6    over the last many months, Efrem has continued to reach out and

7    be honest about their struggles, very honest, and I'm

8    heartened.  They are very clearly committed to being a better

9    person, and their continued profound honesty laid bare in these

10   correspondences."

11        I have read just a small excerpt, but that gives you a

12   glimpse of what I took away from these letters.  These are

13   really impressive testimonials, Mx. Zelony-Mindell.  On a day

14   that a person is sentenced, it's right that they be evaluated

15   in the totality of the life's experiences, the good as well as

16   the bad, the opportunities presented to you as well as the

17   obstacles.  These letters stand in your favor today.

18        In the end, apart from the guidelines calculation, the

19   government and the probation department recommend a sentence of

20   120-months' imprisonment, which reflects a significant downward

21   variance.  The defense recommends a sentence of 60-months'

22   imprisonment, which reflects an even more substantial variance.

23   I've considered those recommendations.  I've given attention in

24   the aggregate to cases whose offense conduct have a resemblance

25   of this.  Although, no two cases are alike and the personal

NBERZELs

journeys and characteristics of the defendant ultimately are

unique, my judgment in the end is this:  All parties wisely

recommend a sentence well below the guidelines, and that is

right for various reasons, including that, among others, the

guidelines are out of date being based on patterns of

sentencing decades ago.  The guidelines do not give nuanced

attention to the facts, but paint with a very broad brush that

largely treats all people who commit this offense or these

offenses alike.  I'm mindful as well that this was a first

offense and an anomalous one in your experience.  And I'm

mindful that there are powerful mitigating factors of the sorts

I identified earlier, and I'm mindful as well that I see hope

for improvement and greater psychological health.  These

factors do favor, as all agree, a significant downward

variance.

        I can't, however, with respect, agree to the sentence

of the defense.  The horrific nature of the inducement of the

nine-year-old boy to engage in forceable sex, the substantial

steps towards the consummation of that you took, as to the

point of arrest, and the separate, but also grave offense, of

not just consuming but distributing vile child pornography, in

my judgment, together would make a five-year sentence simply

disproportionate to the gravity of the offense and, therefore,

unreasonable.

        The government's sentence is in contrast reasonable.

NBERZELs

1   That said, my duty is to impose not only a reasonable sentence

2   but the lowest reasonable sentence that can fairly accommodate

3   the 3553(a) factors considered together.  After considerable

4   reflection, my conclusion is that a sentence below the one

5   recommended by the government, not dramatically below but

6   below, would fairly reflect these factors.  I'm going to impose

7   such a sentence, and I find it to be the lowest one compatible

8   all-in with the sentencing factors.

9          I want you to know that in assessing the just

10   sentence, I have considered as well the deplorable conditions

11   of pretrial custody in which you've been held.  As in other

12   cases, I've credited you for more than one day served for each

13   day that, in fact, you were in such custody.  And your

14   sentence, therefore, would be lower than it otherwise would

15   have been on account of those conditions.

16          I'm now going to formally state the sentence I intend

17   to impose.  The attorneys will have a final opportunity to make

18   legal objections before the sentence is finally imposed.

19   Mx. Zelony-Mindell, would you please rise.  After assessing the

20   particular facts of this case and the factors under section

21   3553(a), including the sentencing guidelines, it is the

22   judgment of the Court that you are to serve a sentence of

23   90-months' imprisonment in the custody of the Bureau of Prisons

24   to be followed by a period of five-years' supervised release.

25          MR. MARVINNY:  I'm sorry, your Honor.  Did you say 90

NBERZELs

or 98?

        THE COURT:  Nine zero.

        MR. MARVINNY:  Thank you.

        THE COURT:  As to supervised release, the standard
conditions of supervised release shall apply.  In addition, you
shall be subject to the following mandatory conditions:  You
shall not commit another federal, state or local crime.  You
shall not illegally possess a controlled substance.  You shall
not possess a firearm or destructive device.  You must
cooperate in the collection of DNA as directed by the probation
officer.  You must make restitution, and I'm going to give the
government 90 days to submit a proposed restitution order, but
you will be required to make restitution in connection with the
dictates of that order.

        I'll request Ms. Daniels kindly to make sure,
materially before the proposed order comes to me, that you have
sent it Mr. Marvinny so that he cannot not only review it but
consult with his client about it.  And as soon as you get
information about victims, please relate them Mr. Marvinny so
he is reflecting on these issue in realtime.

        MS. DANIELS:  Yes, your Honor.

        THE COURT:  To continue on, you must apply with the
SORNA, the Sex Offender Registration and Notification Act, as
directed by the probation officer, Bureau of Prisons, or any
state sex offender registration agency in which you reside,

NBERZELs

1    work or are a student or were convicted of a qualifying

2    offense.  Now, there's a number of special conditions, and I'm

3    going to briefly summarize each of them.  Let me ask you,

4    Mr. Marvinny, these are lengthy to read.  Is it correct that

5    you have reviewed these in detail why your client?

6              MR. MARVINNY:  That is, correct, your Honor.

7              THE COURT:  All right.  So if I summarize them and

8    then state that I'm incorporating them verbatim by reference,

9    is that okay?  Has your client familiarized himself with all of

10   the special conditions in the presentence report as written?

11             MR. MARVINNY:  Yes, your Honor, including earlier

12   today so that is absolutely fine to summarize.

13             THE COURT:  And, Mx. Zelony-Mindell, is that correct

14   that you have, in fact, read the special conditions of the

15   presentence report?

16             THE DEFENDANT:  Yes, your Honor.

17             THE COURT:  All right.  So just briefly, I'm going to

18   give you the top-line summary.  The first requires you will

19   undergo a sex offender specific evaluation and participate in

20   an outpatient sex offender treatment and outpatient mental

21   health treatment program approved by the probation office.  The

22   second one requires you to submit your person, any property,

23   residence, vehicle, papers, computer or other electronic

24   communication, data storage device, cloud storage or media, and

25   effects to a search by the probation department and, if needed,

NBERZELs

with the assistance of other law enforcement.  That search is
to be conducted when there's reasonable suspicion to believe
that you are either committing a new crime or violating a
condition of release.

Here is why I am doing that.  I appreciate that this a
first offense.  I appreciated that you accepted responsibility
immediately, but the gravity of this crime is so horrific and
the consequences to the world of your recidivating are so
terrible that I want to put in place every muscular deterrent
possible.  If you know that the probation department has
maximum eyes on you, whether through your electronics, your
home, your car, whatnot, if you have any temptation to make a
mistake again, to commit a crime again, I want you to know that
the odds are maximal that you will get caught.  And if that
holds any bad impulse in check, that's a good thing.

You are to permit the probation department to install
any application or software that allows it to survey and
monitor all activity on your computer and associated devices.
You are restricted from viewing, accessing, possessing and/or
downloading any sexually explicit material involving minors.
You are not to access any websites, chat rooms, internet
messaging or social networking sites where your criminal
history, including this conviction, would render such access in
violation of the terms of service of that website, chat room,
et cetera.  You must not have deliberate contact with any child

NBERZELs

under age 18 unless approved by the U.S. Probation Office, and

as you'll see, as you know, that condition also extends to

loitering within 100 feet of places regularly frequented by

children.  I'm relying on Mr. Marvinny and your representation

that you've read these details, but you need to familiarize

yourself with them.  And when you are released on probation, I

know that you will have to sign a form that reflects your

familiarity with this.  Just be aware I'm approving every last

bit of the proposed special conditions here.

Again, you must participate in a mental health

outpatient program approved by the probation office, and you

must participate in an outpatient treatment program approved by

the probation office, whose program may include testing to

determine whether you have reverted to the use of drugs or

alcohol.  I'm not going to impose a fine.  I'm persuaded you

don't have the ability to pay it.  As I said earlier, I'll

defer restitution until later.  The government is not seeking

forfeiture, correct?

MS. DANIELS:  That's correct.

THE COURT:  I'm required to impose a mandatory special

assessment of $100.  It shall be due immediately.  Although

otherwise two other special assessments would have been due, I

find you to be indigent, and, therefore, unable to pay those

assessments, and I'm not going to impose them.

All right.  With all of that, does any counsel know of

NBERZELs

any legal reason why the sentence should not be imposed as
stated?

MS. DANIELS:  No, your Honor.

MR. MARVINNY:  No, your Honor.

THE COURT:  All right.  The sentence as stated is
imposed.  There are open counts; does the government now move
to dismiss them?

MS. DANIELS:  Yes.

THE COURT:  All right.  Granted.

Mx. Zelony-Mindell, to the extent you haven't given up
your right to appeal your conviction and your sentence through
your plea of guilty and the plea agreement you entered into
with the government in connection with this plea, you have the
right to appeal those things, your conviction and your
sentence.  If you are unable to pay for the cost of an appeal,
you may apply for leave to appeal in forma pauperis.  The
notice of appeal must be filed within 14 days of the judgment
of the conviction.

From the government, is there anything further?

MS. DANIELS:  Your Honor, I might have missed it
earlier but whether the Court adopts the presentence report?

THE COURT:  Oh, I thought I captured that right at the
beginning when I found there were no factual corrections, but,
yes, I certainly intended to do so.  If I forgot that, that
would not have been good.  I do adopt it.

NBERZELs

1          All right.  Mr. Marvinny, anything from you?  I know

2     you want me to recommend Petersburg.

3          MR. MARVINNY:  That's it, your Honor.  My other

4     request is for when we're done, absolutely done otherwise,

5     which is Mx. Zelony-Mindell has asked if he might have a brief

6     contact visit.

7          THE COURT:  Yes, I'll be happy to make that time

8     available.  I acknowledge that the facility that you have

9     recommended and I'll be recommending, probably inherently picks

10    up the program that you have in mind, but if there's some

11    specific recommendation you would like me to make, I'll be

12    delighted to consider it.

13         MR. MARVINNY:  Yes, your Honor.  Thank you.  That's a

14    fantastic idea.  The Sex Offender Management Program,

15    specifically, it might be worth endorsing a judgment to that

16    effect.  So FCI Petersburg, and specifically it's called the

17    SOMP, but the Sex Offender Management Program they offer there.

18    That would be very helpful, and we'd appreciated it.

19         THE COURT:  S-U-M-P?

20         MR. MARVINNY:  S-O.

21         THE COURT:  Sex Offender Management Program, and the

22    recommendation is that he be admitted to participate in that

23    program?

24         MR. MARVINNY:  Correct, your Honor.

25         THE COURT:  I thought the entire facility is

NBERZELs

1    sex-offender focused?

2            MR. MARVINNY:  I don't think that's exactly right.

3    First of all, there are four different Petersburgs of various

4    securities.

5            THE COURT:  You are looking at Richmond, Virginia,

6    right?

7            MR. MARVINNY:  It's in Hopewell, Virginia.  I don't

8    know if that's near Richmond.

9            THE COURT:  The Petersburg facility that I, again,

10   visited in early judge school was a sex-offender-specific

11   facility in Petersburg, Virginia.  I thought that is what you

12   were recommending precisely because it's a sex-offender

13   specific facility.

14           MR. MARVINNY:  That is right, your Honor, but there

15   are -- I think Petersburg has multiple institutions.  For

16   example, there's a high -- like a U.S. penitentiary in

17   Petersburg as well within the same compound.

18           THE COURT:  They are affiliated but in different

19   states?

20           MR. MARVINNY:  No, no.  They are the same.

21           THE COURT:  What state are you --

22           MR. MARVINNY:  Virginia.

23           THE COURT:  All right.

24           MR. MARVINNY:  I looked it up today.  I thought it was

25   in Hopewell, Virginia, not Richmond.

NBERZELs

1        THE COURT:  That is correct.  Forgive me, too much

2   information here.  We were in Richmond and traveled to

3   Petersburg.  My bad to say Richmond.  It's in Virgina.  Okay.

4   We're on the same page.

5        MR. MARVINNY:  Suffice to say, I think a

6   recommendation that they be designated to FCI Petersburg and

7   the SOMP program there would be sufficient.

8        THE COURT:  Okay.  Look, I'm happy to be make that

9   recommendation.  It would be surprising to me if he weren't

10  admitted to a program of that nature given the nature of

11  conviction, but it certainly can't hurt for me to recommend it.

12  I'm happy to do so.

13        MR. MARVINNY:  Thank you.

14        THE COURT:  All right.  I realize I forgot to give the

15  date by which the restitution order is due.  I need to file it

16  by February 12.  So, Ms. Daniels, I'll ask for it a week

17  beforehand just so I can reflect on it, and if I have to get

18  input from counsel, I'll have time to do that before the

19  deadline expires.

20        MS. DANIELS:  Yes, your Honor.

21        THE COURT:  Anything further from the defense?

22        MR. MARVINNY:  No, your Honor.

23        THE COURT:  Before we adjourn, I want to say a couple

24  things.  First of all, Mx. Zelony-Mindell, you've heard me say

25  in very strong terms how bad the offense was.  I don't need to

NBERZELs

1    say any more about that, but I do want to say to you how

2    horrified I was by aspects of your early journey.  While

3    explaining an offense is not excusing it, I got a much, much

4    better idea of how you came to take the turn that you did.  And

5    I am so, so sorry that you had those experiences, and you have

6    my empathy.  More than that, like I say, the letter you wrote

7    and the letter your father wrote and the letter your father's

8    partner wrote and the people who know you best know about you,

9    make it clear to me that, candidly, unlike some defendants

10   before me, there's an entirely different narrative here besides

11   the offense narrative.  And you are clearly a creative,

12   artistic, bright expressive person, and more than that, a

13   person of great connection and empathy to the people you care

14   about.  You've got a lot to offer this world, and I really want

15   to wish you the very best.  And while it's a horribly loud

16   wake-up call, and it's too bad it had to be this loud and this

17   long, when you emerge you'll, trust me, still be a young man

18   with a lot to offer.  I wish you the very best.  I'm cheering

19   for you.

20           THE DEFENDANT:  Thank you, your Honor.

21           THE COURT:  Beyond that, I want to acknowledge the

22   family and friends who are here.  I can imagine how hard this

23   is today.  Specifically to Charles Mindell, you suffered as

24   well during the same time your son was, and I was very sorry to

25   read that.  And from the accounts I've been given about you,

NBERZELs

1   you were nothing short of heroic under very, very hard

2   circumstances.  You have my admiration.  I pay attention to the

3   way fathers father, and I have a lot of admiration for you and

4   for the way, under what must have been an unimaginable time

5   over the last 12-plus months, you have been by your son's side.

6   Anyway, I have a lot of admiration for you.  I wish you the

7   very best.

8        I want to thank all the others who participated here

9   today.  The fact that you are here today, the fact that so many

10  people wrote those impressive letters, tells me that you are

11  here for the long-term.  And one of the next most important

12  dates for Mx. Zelony-Mindell is going to be when he is released

13  from prison and rejoins the community.  The fact that everyone

14  is here today, came up to New York for this, tells me that

15  you're going to be, you know, with him for the long-term, and

16  he needs that, and that's very encouraging to me.  In any

17  event, I wish all of you well.  We stand adjourned.

18        (Adjourned)

19

20

21

22

23

24

25